George MANETAS and Damianos Makris, Appellants,

v.

INTERNATIONAL PETROLEUM CARRIERS, INC., and the M/T CARIB SUN, her engines, tackle, furniture and appurtenances

International Petroleum Carriers, Inc., Claimant.

No. 75–2085.

United States Court of Appeals, Third Circuit.

Argued March 26, 1976.

Decided Aug. 31, 1976.

Baker, Garber, Duffy & Baker, P. C., Hoboken, N. J. (Herbert Lebovici, New York City, of counsel), for appellants.

McCarter & English, Newark, N. J. (Healy & Baillie, Thomas L. Rohrer, New York City, of counsel), for appellees.

Before SEITZ, Chief Judge, and KALODNER and ROSENN, Circuit Judges.

## OPINION OF THE COURT

KALODNER, Circuit Judge.

Plaintiffs, George Manetas and Damianos Makris, Greek seamen employed aboard the "Carib Sun," a cargo vessel sailing under the Liberian Flag and owned by defendant, International Petroleum Carriers, Inc., brought this action to recover approximately 9 months' wages, on the ground that they were employed for a one-year term and were wrongfully discharged after three months of employment. The discharge occurred after the ship's main engine sustained damages during a storm on its transatlantic crossing. Plaintiffs' complaint alleged that Section 30 of the Liberian Maritime Law, which expressly incorporates "the non-statutory general Maritime Law of the United States,"[1] permits recovery for premature discharge of a seaman in violation of a contract for an express period of employment. The complaint also sought

---

1. Title 22 of the Liberian Code of Laws of 1956, as amended through 1973, Section 30, provides:

   "Insofar as it does not conflict with any other provisions of this Title, the non-statutory general Maritime Law of the United States of America is hereby declared to be and is hereby adopted as the general Maritime Law of the Republic of Liberia."

   The ship's Articles provided that "[a]ll rights and obligations of the parties to these Articles shall be subject to the Laws and Regulations of the Republic of Liberia."

recovery of "overtime" wages earned during plaintiffs' employment which allegedly went unpaid, and damages for non-payment of their claimed wages pursuant to 46 U.S. C.A. §§ 596 and 597.[2]

Cross-motions for summary judgment were filed by the parties. The defendants in their cross-motion contended that (1) the damages sustained by the Carib Sun amounted to a "loss" or "wreck" of the vessel, and pursuant to 46 U.S.C.A. § 593,[3] discharge of plaintiffs was justified; and (2) plaintiffs' claims for "overtime" wages were not supported by any proof. The district court granted summary judgment in favor of the defendants and against the plaintiffs on the grounds that (1) notwithstanding § 30 of the Liberian Code, "[t]he Carib Sun had been so damaged by the perils of the sea that it was incapable of further voyaging" and "[i]t was  .   .   . a wreck" within 46 U.S.C.A. § 593, which entitles plaintiffs to wages " 'for the time of service prior to such termination, but not for any further period;' " and (2) the claims for "overtime" wages were "unfounded" and "inconsistent with the discernable facts."

We agree with the district court's holding concerning plaintiffs' claim for wrongful discharge. With respect to plaintiffs' "overtime" claims, however, we believe they presented a genuine issue as to a material fact, and that being so, the district court was precluded from entering summary judgment against the plaintiffs as to these claims.

Discussion of our stated holdings must be prefaced by the following summarization of the facts and proceedings below:

Liberian Shipping Articles, opened aboard the Carib Sun at Piraeus, Greece on January 26, 1973, provided, *inter alia*, for the Carib Sun to sail from "Piraeus, Greece to World Wide Trading and such other ports and places in any part of the world as the Master may direct, for a term (of) (not exceeding) twelve calendar months  .   ."

On February 28, 1973, and March 2, 1973, plaintiffs Manetas and Makris, respectively, entered into individual employment agreements—Manetas as Second Officer at a wage of $700 per month and Makris as Boatswain at $500 per month. The contracts signed by plaintiffs did not specify a

---

**2.** 46 U.S.C.A. § 596 provides in pertinent part as follows:

"The master or owner of any vessel making coasting voyages shall pay to every seaman his wage within two days after the termination of the agreement under which he was shipped, or at the time such seaman is discharged, which first happens; and in case of vessels making foreign voyages, or from a port on the Atlantic to a port on the Pacific, or vice versa, within twenty-four hours after the cargo has been discharged, whichever first happens; and in all cases the seaman shall be entitled to be paid at the time of his discharge on account of wages a sum equal to one-third part of the balance due him. Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made before the court; but this section shall not apply to masters or owners of any vessel the seamen of which are entitled to share in the profits of the cruise or voyage.  .   .   . "

46 U.S.C.A. § 597 provides in pertinent part as follows:

"Every seaman on a vessel of the United States shall be entitled to receive on demand from the master of the vessel to which he belongs one-half part of the balance of his wages earned and remaining unpaid at the time when such demand is made at every port where such vessel, after the voyage has been commenced, shall load or deliver cargo before the voyage is ended, and all stipulations in the contract to the contrary shall be void: *Provided*, Such a demand shall not be made before the expiration of, nor oftener than once in five days nor more than once in the same harbor on the same entry. Any failure on the part of the master to comply with this demand shall release the seaman from his contract and he shall be entitled to full payment of wages earned."

**3.** 46 U.S.C.A. § 593 provides in pertinent part:

"In cases where the service of any seaman terminates before the period contemplated in the agreement by reason of the loss or wreck of the vessel, such seaman shall be entitled to wages for the time of service prior to such termination, but not for any further period."

term of service; however, the Shipping Articles did specify that the "agreement between the Master and Seaman is for period of one calendar year."

On March 18, 1973, the Carib Sun sailed from Piraeus, loaded a cargo of gasoline in Turkey, and on March 25, 1973, set sail for the United States.

On or about April 16, 1973, the vessel encountered a heavy storm causing damage to the main engine crossheads, bearings and cranks, the effect of which was to permit sea water to enter the lube oil tank and contaminate the vessel's oil system. On April 20, 1973, the vessel arrived at Linden, New Jersey, under her own power and discharged her cargo.

A marine surveyor inspected the ship and confirmed that the engine damage was so extensive that it had to be repaired before the vessel could continue its voyage.

The ship was then towed to a shipyard in Hoboken, New Jersey, and bids for the ship's repair were sought. Of seven bids solicited, three were returned, estimating costs of repair in excess of $500,000 and time for repair at a minimum of eighty days.

After the extent of the damages became known, the members of the crew were discharged several at a time in May, 1973. Manetas and Makris were discharged on May 21, 1973 and were offered airline tickets to Greece.

The plaintiffs' independent claims for "overtime" wages were detailed in their depositions as follows:

Manetas claimed that after the ship had reached Hoboken, one mate was discharged and the duty fell to him and another to stand watch every second night rather than every third night. He alleged that he signed off the ship May 21, 1973, and that until that date he had stood two extra twelve-hour watches which should have been compensated at an overtime rate of $1.50 per hour; he claimed a total of $36.00 was due.

Makris claimed he performed duties outside the scope of his responsibilities as boatswain during the course of his 8-hour shift, viz., cleaning the ship's forepeak and tanks and work in the ship's pump room. He calculated that he performed these "special jobs" during 38 hours of his daily work schedules and that he was entitled to an "over-time" rate of $1.20 per hour as to these hours.

Plaintiffs filed the instant complaint on May 23, 1973.

On July 5, 1973, the vessel was sold to North East Petroleum, Inc., the original charterer; repairs then undertaken consumed three months.

On August 13, 1973, plaintiffs filed a motion for partial summary judgment on the issue of liability which, after a hearing, was denied on the basis of insufficient evidence.

On December 16, 1974, a Pre-Trial Order was filed by both parties. The Order provided that "[e]ach side is granted leave to file respective motions for summary judgment within 45 days from the date hereof." In an accompanying memorandum defendants contended that the damages sustained by the Carib Sun's "engines in the Atlantic crossing amounted to a 'loss' or 'wreck' of the Vessel and justified the discharge of the crew."

On January 20, 1975, plaintiffs again moved for summary judgment.

On June 13, 1975, defendants filed an Affidavit in Opposition to Second Motion for Summary Judgment requesting the Court to treat their answering papers as a cross-motion for the same relief. Affidavits of Eugene F. Blondell, Jr. and Peter Siebel, Jr., who were, respectively, an employee of the ship's agent in New York, and the marine surveyor engaged by the defendants to survey the damages, were submitted. The affidavits detailed the extensive damages sustained by the Carib Sun in its Atlantic crossing.

In opposing plaintiffs' "overtime" wage claims, defendants relied on the deposed testimony of the plaintiffs and the ship's Master. The Master of the ship had testi-

fied that while the ship was moored in Hoboken, the mates performed no work during the normal eight-hour-work day; Manetas stood watch on board "for the security of the vessel;" and he was on board the ship in May only seven days of 21. A wage statement for May, which was made a part of the record, showed that Manetas was paid eight hours for 21 days in May and for seven hours overtime. In addition, the Master testified that Manetas never told him that he was entitled to any additional overtime. Makris testified that he had been told by the ship's Chief Officer that there was "no money for extra work on this vessel;" and that he signed his pay voucher dated May 1, 1973, which was made part of the record. The Master testified that Makris had never complained to him that more pay was due.

The district court filed its Letter Opinion and Order on August 6, 1975, denying plaintiffs' motion for summary judgment and granting defendants' motion for summary judgment for the reasons heretofore mentioned.

The court made the following findings with respect to the "overtime" claims:

"In his deposition plaintiff Makris, who served on the crew in the capacity of boatswain, concedes that the thirty-eight hours which he claims are due as overtime are not in fact hours in excess of eight on a given day for which he was not paid; rather, he claims he performed duties outside his regular responsibilities as boatswain during his regular eight hour day for which he demands additional wages, apparently an hour of overtime for each such hour of work. That certainly is not overtime wages. If Makris was concerned that the work was not his responsibility, he should have presented the grievance to the Master for resolution; but because he undertook to do the work, the only wage governing was that in the Articles. Because the "extra work" did not involve extra hours for which he was not compensated, the Court must consider the claim unfounded.

"... Even if Manetas was ordered to remain aboard the vessel, with which the Master specifically disagreed, he was only fulfilling his duty. Manetas was not performing any other obligation while the vessel was moored. He in fact was aboard the vessel in May only seven days of the twenty-one (See Filias depo. filed Oct. 15, 1974, p. 42), but was paid eight hours each day. If Manetas had been required to stand watch every second night, he would have stood at least three additional watches; thus his claim is inconsistent with the discernible facts. The wage statement for May shows that Manetas was paid eight hours for twenty-one days in May (21/30 × $700/month) and for seven hours of overtime. Since no duties were being performed, that wage statement specifically supports the Master's statement that Manetas claimed seven hours of overtime and was paid for that. The only item that plaintiff has presented in support of his motion for summary judgment is a mere statement that twenty-four hours at the overtime rate are due: no dates are given; no assertion is made that the watch was stood in addition to a regular eight hour day; and no explanation is given for the duties performed for which plaintiff was paid. In sum, it is apparent that the watch duty, even if it was ordered, was the only work performed by Manetas after May 2."

On this appeal, Manetas and Makris press the following contentions:

(1) The district court committed error in applying 46 U.S.C.A. § 593, the Wreck Statute, to resolve their "wrongful discharge" claim;

(2) The district court was precluded from considering the "wreck" issue because it was allegedly first raised in defendants' cross-motion and supporting affidavits filed after expiration of a 45-day limitation fixed by the December 16, 1974 Pre-Trial Order.

(3) The district court failed to timely rule on plaintiffs' objections to defendants' affidavits, and thus plaintiffs were deprived of

the opportunity to file counter-affidavits on the issue as to whether the vessel was a "wreck."

(4) Assuming *arguendo* the applicability of the Wreck Statute, whether or not the Carib Sun was a "wreck" is a question of fact which could not be decided by summary judgment;

(5) the record supports their motion for summary judgment as to the "overtime" claims.

■ It must immediately be noted that the plaintiffs' second point is without merit for these reasons: (1) while the "wreck" issue was not presented in the pleadings, it was raised by the defendants in their Pre-Trial Memorandum which accompanied the December 1974 Pre-Trial Order; and (2) the 45-day Pre-Trial Order limitation for filing motions for summary judgment was not a bar to a later filing because Fed.R. Civ.P. 56(b) expressly authorizes a "defending party" to move "at any time" for a summary judgment.

■ Plaintiffs' third contention that they were deprived of the opportunity to file counter-affidavits on the "wreck" issue must also be rejected. Plaintiffs were not relieved of the duty to file controverting affidavits merely because they challenged the sufficiency of the defendants' affidavits and did not get a timely ruling by the district court.

It must be noted parenthetically that the plaintiffs' objections to the defendants' affidavits on the ground that they were not timely filed were raised in a letter to the court which was not made part of the record.

■ It is well settled that cross-motions for summary judgment do not warrant the court in granting summary judgment unless one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed.

*Rains v. Cascade Industries, Inc.,* 402 F.2d 241, 245 (3d Cir. 1968); *F. A. R. Liquidating Corp. v. Brownell,* 209 F.2d 375, 380 (3d Cir. 1954). This can be established by the pleadings, depositions, admissions on file and affidavits. *Shaughnessy v. Penn Central Transportation Co.,* 454 F.2d 1223, 1225 (3d Cir. 1972); *Kress, Dunlap & Lane, Ltd. v. Downing,* 286 F.2d 212, 214 (3d Cir. 1960). The party who moves for summary judgment has the burden of demonstrating that there is no genuine issue of fact. *Id.* at 215.

We agree with the district court that plaintiffs, as a matter of law, are not entitled to recover unearned wages because, as the record uncontrovertibly discloses, their employment was properly terminated due to the "wreck" of the vessel. Clearly in point is *Avgoustis v. Erini Shipping Co.,* 177 F.2d 461 (2d Cir. 1949). There, fourteen Greek nationals serving board a Panamanian cargo vessel were discharged when its charter was cancelled on account of heavy weather damage sustained on the second day of voyage. The seamen instituted a libel action against the shipping company seeking recovery of unearned wages under 46 U.S.C.A. § 594[4] and liquidated damages under §§ 596 and 597. The Second Circuit, speaking through Judge Augustus N. Hand, affirmed the district court's dismissal of the libel on the ground that the voyage had been interrupted due to perils of the sea, and thus the vessel was legally entitled to discharge the crew and to pay them only up to the date of discharge, under 46 U.S.C.A. § 593. Of special significance is the Court's holding at page 463:

"*The above Section 593 is directly derived from § 4526 of the Revised Statutes. Section 4526 has been construed by District Judges Soper, Hanford and Benedict, all especially experienced in maritime law, as not limited to cases where a ship has been totally destroyed but as covering situations where a ship has been so injured by encountering ordinary perils of navigation that she is unfit to com-*

---

**4.** Section 594 permits recovery of thirty days additional wages beyond the period of service by way of an improper discharge.

*plete the particular voyage commenced. The Quaker City,* D.C.Md., 290 F. 409; *The Charles D. Lane,* D.C.N.D.Wash., 106 F. 746; *Flanagan v. United States & Brazil Mail S.S. Co.,* D.C.E.D.N.Y., 30 F. 202. These decisions are logical and persuasive, and we hold that because of 46 U.S.C.A. § 593, the seamen were entitled to no more than wages for the period prior to the termination of a service which ended by reason of a loss or wreck. These wages were paid to the libellants and they can lawfully claim no more.

"The provisions in section seven of the ship's articles that the rights and obligations of the persons signing the articles 'shall be determined exclusively by the Commercial Code, the Civil Code and other laws of the Republic of Panama' do not affect the libellants' rights to sue for a discharge where the discharge was due to 'loss or wreck of the vessel.' In such a situation, their rights are specially limited by 46 U.S.C.A. § 593 which has been uniformly and, as we hold,, properly construed to preclude recovery under 46 U.S.C.A. § 594. *In other words, § 593 as well as § 594 where it is applicable, embraces all seamen suing for wages in United States ports, and is controlling under our laws.* We, therefore, cannot sustain the cross-assignments of error of the respondent based on the theory that Panama law should have been proved by the libellants for under 46 U.S.C.A. § 593 the vessel suffered 'loss or wreck,' and that fact precludes liability under § 594." (emphasis supplied).

This holding has been applied in later cases. *Fowles v. American Export Lines, Inc.,* 449 F.2d 1269 (2d Cir. 1971); *Sharpe v. United States,* 322 F.Supp. 243 (E.D.N.C. 1971). *See also Henderson v. Arundel Corp.,* 262 F.Supp. 152 (D.Md.1966), *aff'd,* 384 F.2d 998 (4th Cir. 1967); *Lunquist v. SS*

*Seatrain Maryland,* 359 F.Supp. 663 (D.Md. 1973).

Based on the foregoing authorities, we are in agreement with the district court's holding that "[t]he Carib Sun had been so damaged by the perils of the sea that it was incapable of further voyaging" and "[i]t was . . . a wreck" within 46 U.S.C.A. § 593.

We disagree, however, with the district court's entry of summary judgment against the plaintiffs with respect to their "overtime" claims. The district court erred in making a factual determination as to the merit of these claims based on its evaluation of the parties' conflicting depositions. Documents filed in support of a motion for summary judgment are to be used to determine whether issues of fact exist and not to decide the fact issues themselves. *United States ex rel. Tyrrell v. Speaker,* 471 F.2d 1197 (3d Cir. 1973); *Krieger v. Ownership Corporation,* 270 F.2d 265 (3d Cir. 1959).[5]

For the reasons stated, the Judgment of the district court granting the defendants' motion for summary judgment "on all counts of the complaint" will be affirmed insofar as it relates to the plaintiffs' claims for wrongful discharge, and vacated insofar as it relates to the plaintiffs' "overtime" claims, and the cause remanded with instructions to proceed in accordance with this opinion.[6]

---

5. The defendants implicitly concede here that the district court made a material factual determination as to the "overtime" claims in urging that they "were contradicted by all of the credible evidence." (Brief for Defendants-Appellees, p. 19).

6. Since the "overtime" claims total but $81.60, we anticipate that the parties will realize that their self-interest, and the judicial economy, will be best served by forthwith amicable disposition of these claims.