**IOWA ELECTRIC LIGHT AND POWER COMPANY, a corporation, Plaintiff,**

v.

**ALLIS–CHALMERS MANUFACTURING COMPANY, a corporation, Defendant.**

**Civ. No. 9–2472–C–2.**

United States District Court,
S. D. Iowa, C. D.

June 14, 1973.

John W. Morrison, Chicago, Ill., and John B. Grier, Marshalltown, Iowa, for plaintiff.

Eugene Davis, Des Moines, Iowa, for defendant.

## MEMORANDUM AND ORDER

HANSON, Chief Judge.

This matter is before the Court upon defendant's Motion for Summary Judgment. This is a products liability case. Plaintiff's complaint is in six counts; Count I is on implied warranty, Count II is on express warranty; Count III is for breach of contract; Count IV pleads strict liability in tort; Count V pleads negligence on the basis of *res ipsa loquitur;* and Count VI, an amendment, adds the allegation of willfullness to each of the preceding Counts. By agreement of the parties, the allegations of Count VI are not at issue in this motion, and any motion with respect to Count VI will be determined at a later time.

The controversy centers around a transformer which was manufactured by Allis-Chalmers Manufacturing Co., the defendant herein, for Iowa Electric Light and Power Co., the plaintiff herein, in 1958.

The pertinent uncontroverted facts in this lawsuit are as follows:

On June 24, 1958, defendant sent to plaintiff a proposal, Proposal DAV–2615, for sale and delivery of the transformer central to this action. Included within that proposal were the following conditions of sale:

*"Warranty and Tests.*

Company warrants that the equipment will be of the kind and quality described herein and free of defects in

workmanship and material. No other warranty, except of title, shall be implied, and any statutory warranties shall be deemed waived. This warranty shall extend for one year from date of shipment; but if equipment is installed by the Company or the work of installation is supervised by a Company representative, the warranty shall run for one year from date of completion of installation, or eighteen (18) months from date of shipment, whichever occurs first.

Company shall be notified of and may witness any acceptance tests that may be specified or agreed upon. Such tests shall be conducted within the warranty period unless otherwise agreed on.

*Liability.*

If any failure to comply with the warranty appears within the time limited therein and the Purchaser promptly notifies Company, Company shall be liable, and shall have the right to remedy any such failure by, at Company's option, adjustment, or repair, or replacement f. o. b. shipping point of any affected part of the equipment.

Company's liability to purchaser whether in contract or in tort arising out of warranties, representations, instructions, or defects from any cause, shall be limited to correcting the equipment as aforesaid.

\*   \*   \*   \*   \*   \*

*General.*

Company shall not in any event be liable for indirect, special, consequential or liquidated damages or penalties."

On July 3, 1958, plaintiff accepted the proposal by mailing to defendant plaintiff's Purchase Order No. 25091, ordering the equipment described in the proposal "[a]ll in accordance with Proposal DAV–2615 dated June 24, 1958 based on Skeleton Specifications."

On July 7, 1958, defendant sent to plaintiff its Order of Acceptance in which the conditions of sale above described were again set out.

The transformer had a failure on February 22, 1965, after being in service 6 years. Plaintiff requested defendant to repair the transformer at plaintiff's expense. Defendant accepted this request and incorporated in the acceptance the same conditions as have been heretofore set out. Plaintiff paid the defendant the agreed price for the repairs.

The transformer again failed on January 27, 1968. After this occurrence, plaintiff again requested defendant to furnish materials and certain services for repair of the transformer. Defendant complied, and plaintiff paid for the same.

The defendant, in its motion, urges that the contract between the parties be enforced in accordance with the "conditions of sale." The plaintiff contends that the disclaimers in the contracts do not preclude recovery.

### I.   *Strict Liability in Tort.*

With respect to plaintiff's Count IV, sounding in strict liability in tort, the defendant contends (1) that the disclaimers and limitations on damages found in the contracts preclude recovery on this theory, and (2) that the theory of strict liability does not encompass a prayer for commercial loss damages.

The Supreme Court of Iowa has approved recovery, in certain instances, under the tort theory of strict liability for defective products, adopting the principles found in Restatement, Second, Torts, Section 402A. • Hawkeye Security Insurance Co. v. Ford Motor Co., 174 N. W.2d 672, 684 (Iowa 1970) [hereinafter *Hawkeye I*]. Section 402A allows recovery under strict liability in tort for physical harm to the ultimate user or consumer, or to his property, which is caused by a defective product.

The question of whether plaintiff waived his cause of action sounding in strict liability in tort because of disclaimers in the contracts must be resolved against the defendant. In Hawkeye Insurance Co. v. Ford Motor Co., 199 N.W.2d 373, 381 (Iowa 1972) [here-

inafter *Hawkeye II*], the court said: "Further, strict liability in tort is not based on the Uniform Commercial Code and is not subject to disclaimer." Comment (m) to Section 402A of Restatement, Second, Torts, states:

> The rule stated in this Section is not governed by the provisions of the Uniform Sales Act, or those of the Uniform Commercial Code, as to warranties; and it is not affected by limitations on the scope and content of warranties, or by limitation to "buyer" and "seller" in those statutes. Nor is the consumer required to give notice to the seller of his injury within a reasonable time after it occurs, as is provided by the Uniform Act. The consumer's cause of action does not depend upon the validity of his contract with the person from whom he acquires the product and it is not affected by any disclaimer or other agreement, whether it be between the seller and his immediate buyer, or attached to and accompanying the product into the consumer's hands. In short, "warranty" must be given a new and different meaning if it is used in connection with this Section. It is much simpler to regard the liability here stated as merely one of strict liability in tort.

Defendant states many policy reasons in support of its position on disclaimer of strict liability in tort. The Court feels, however, that the adoption of such a rule of law would merely again confuse the area of law that Section 402A liability was intended to make simpler.

█ On the other hand, the Court concludes that defendant's argument with respect to the scope of damages under Section 402A is a good one. Courts and commentators have delineated at least four distinct categories of harm which could be held recoverable under the theory of strict liability in tort for defective products: (1) physical injury to persons; (2) physical damage to tangible things other than the product itself; (3) physical harm to the product itself; and, (4) commercial or economic loss which involves no physical harm but which are occasioned by the unfitness of the product. *See* Keeton, Products Liability—Some Observations about Allocation of Risks, 64 Mich.L.Rev. 1329, 1343 (1966). Clearly, the law in Iowa, as in most jurisdictions, allows recovery for damages described in categories (1) and (2). *Hawkeye I, supra*; *Hawkeye II, supra*; Restatement, Second, Torts, Section 402A ("liability for physical harm thereby caused to the ultimate user or consumer, or to his property"). Plaintiff in this case, however, seeks damages for repair of the transformer, acquisition of a temporary transformer in replacement, and "economic loss." Thus, the Court finds itself having to declare Iowa law in an area in which the Supreme Court of Iowa has not clearly spoken.

The Iowa Supreme Court, in the first *Hawkeye* opinion, cited a New Jersey case which allowed recovery for damage to the product itself under the theories of implied warranty and strict liability in tort.[1] Law review writers have interpreted this to mean that the Iowa Court possibly would approve recovery for economic or commercial losses. The commentators note, however, that no such claim was made in the Iowa case.[2]

These commentaries were written before *Hawkeye II* was decided. That case did little to clear the air, however, because of the puzzling language it contains with respect to the instant problem. At page 382 of 199 N.W.2d, the Supreme Court states:

> "Perhaps the best known case involving the conflict between the warranty theories (under the U.C.C.) and strict liability in tort, is the case of Seely v.

---

1. Santor v. A and M Karagheusian Inc., 44 N.J. 52, 207 A.2d 305 (1965).

2. Carmichael, Strict Liability in Tort, 20 Drake Law Review, 528, 549, n. 131 (1971); Comment, Strict Liability for Defective Products in Iowa, 56 Iowa Law Review 706, 713–715 (1971).

White Motor Co., 63 Cal.2d 9, 45 Cal. Rptr. 17, 403 P.2d 145. In the Seely case, Traynor, J., writing for the majority said when there was a personal injury involved, strict tort liability overrides recovery on a warranty theory (again under the U.C.C.); when the loss is purely property, he did not rule out the use of strict tort, but when the loss is economic, such as loss of profit, loss of bargain, loss of business, etc., then the right of recovery must be governed by the warranty approach.

In Seely, Peters, J., concurring in part and dissenting in part, contended it was not the type of loss which should determine the theory of recovery, but rather recovery should depend upon the parties involved; thus, if there was privity between the parties to the action, the warranty approach should control; if there was no privity, the action would be in strict tort."

The Court believes that it is necessary to trace the history of the Hawkeye litigation in order to understand the above quoted passage in *Hawkeye II*. The *Hawkeye* series of actions began when in 1964 a Ford truck operated by Thomas Kolby and owned by Tri-B Corporation ran into a farm-tractor and trailer owned and operated by one La Vern Koppold causing injuries and property damage. Subsequently, Koppold obtained a judgment against Kolby and Tri-B which was compromised and paid by Hawkeye Security Insurance Co. Hawkeye then brought a subrogation suit seeking indemnity from the Ford Motor Co., the manufacturer of the truck, on the theories of strict liability in tort and implied warranty. Ford, in turn, cross-petitioned for indemnity from Kelsey-Hayes Co., the supplier of the brakes for the truck on the theories of strict liability in tort and express warranty. It was alleged in both of the indemnity actions that the accident was caused by defective brakes.

In *Hawkeye I* the issue before the Court was whether Hawkeye could recover against Ford on the theories of strict liability in tort and implied warranty. The Iowa Supreme Court held that Hawkeye could recover on both theories. In articulating the substantive perimeters of the doctrine of strict liability in tort, the Court cited the New Jersey case of Santor v. A and M Karagheusian Inc., *supra, note 1*. The *Santor* case, however, was cited solely as a vehicle to state the policy reasons behind the adoption of the theory of strict liability in tort in Iowa. The *Santor* case was not cited for the proposition that a plaintiff in Iowa can recover for loss of the bargain or economic loss under the theory of strict liability in tort.

*Hawkeye II* was concerned, in part, with whether Ford could, in turn, seek indemnity from Kelsey-Hayes under the theories of strict liability in tort and express warranty. It is in that context that the Supreme Court of Iowa mentioned the *Seely* case, *supra*. The discussion concerned whether Ford could plead both strict liability in tort and express warranty. There was no issue or discussion in the *Hawkeye II* case about whether a plaintiff could recover for loss of the bargain or economic loss under the theory of strict liability in tort.

As can be seen then, from an analysis of the issues involved in the Hawkeye litigation, the Iowa Court has never squarely dealt with the central conflict between the *Seely* and *Santor* cases. Although both of these cases have been cited by the Supreme Court of Iowa, neither has been cited for the proposition covering the issue in this case.

An analysis of the *Hawkeye* cases raises one further problem for this Court. What was the nature of the loss involved in the *Hawkeye* cases; how are the damages sought to be recovered in the *Hawkeye* cases to be characterized? It really makes no difference how the damages are characterized under the warranty theories, for loss of the bargain and consequential damages are clearly recoverable under the theories of express and implied warranty. Thus, the Court is concerned over how the Supreme Court of Iowa would characterize

the damages in the *Hawkeye* cases under the theory of strict liability in tort. The Court believes that in the *Hawkeye* series fact situation, where indemnity is being sought by intermediate tortfeasors against the party ultimately responsible, the damages must be characterized as they would be if being sought by the original injured party. Lewis v. American Hoist & Derrick Co., 20 Cal.App.3d 570, 97 Cal.Rptr. 798. Thus, the damages in the Hawkeye cases would be characterized as damages for physical injury to the person and to other property—as they would be characterized in the original action by the tractor driver. Accordingly, although one would characterize the damages Hawkeye or Ford sought to recover as "commercial" or "economic," they, nevertheless, would be characterized in an indemnity situation as damages for injury to the person or to other property. The *Hawkeye* cases, therefore, do not stand for the proposition that an injured party can recover for economic loss under the theory of strict liability in tort.

The problem still remains, then, of whether Iowa would allow recovery of cost of repairs and economic loss under the theory of strict liability in tort. The extremes of the avenues of approach to the instant problem for the Court are laid out by the *Seely* and *Santor* opinions.

In *Santor*, the plaintiff purchased from a retailer, carpeting that soon began to develop unusual lines. The court held the manufacturer liable for the difference between the price paid for the carpet and its actual market value on the theories of implied warranty and strict liability in tort. The *Santor* court stated:

> As we have indicated, the strict liability in tort formulation of the nature of the manufacturer's burden to expected consumers of his product represents a sound solution to an ever-growing problem, and we accept it as applicable in this jurisdiction. And, although the doctrine has been applied

principally in connection with personal injuries sustained by expected users from products which are dangerous when defective, we reiterate our agreement with Randy Knitwear, Inc. v. American Cyanamid Company, supra [11 N.Y.2d 5, 226 N.Y.S.2d 363, 181 N.E.2d 399], that the responsibility of the maker should be no different where damage to the article sold or to other property of the consumer is involved. And see Morrow v. Caloric Appliance Corporation, 372 S.W.2d 41 (Mo.Sup.Ct.1963). In this era of complex marketing practices and assembly line manufacturing conditions, restrictive notions of privity of contract between manufacturer and consumer must be put aside and the realistic view of strict liability adopted. As was done almost 50 years ago in MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E.1050, 1053, L.R.A. 1916F, 696 (Ct.App.1916), the source of liability must be put "where it ought to be." Its source must be put in the law.

The cases cited in *Santor* on the instant problem dealt with implied warranty.

Seely v. White Motor Co., *supra,* was an action against a manufacturer of a truck for the amount of payments on the purchase price and for lost profits. The Supreme Court of California held that although such an award could properly be sustained on the basis of breach of warranty, it could not be sustained on the theory of strict liability in tort. After the truck had overturned and been damaged, without the plaintiff himself having been personally injured, the plaintiff stopped making payments on the truck and it was re-possessed. The court concluded that the defendant could not be held liable on the basis of strict liability in tort for the plaintiff's commercial losses in connection with his payments on the purchase price and his lost profits. The court stated that the doctrine of strict liability in tort was limited to physical harm to person or property, without being applicable to

commercial losses beyond the extent of such harm. At 403 P.2d 151–152, Chief Justice Traynor stated:

> The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the "luck" of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands. A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will.

> \*   \*   \*   \*   \*   \*

> The rationale of [Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963), where California adopted the theory of strict liability in tort] does not rest on the analysis of the financial strength or bargaining power of the parties to the particular action. It rests, rather, on the proposition that "[t]he cost of an injury and the loss of time or health may be an overwhelming misfortune to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business." (Escola v. Coca Cola Bottling Co., 24 Cal.2d 453, 462, 150 P.2d 436 [concurring opinion].) That rationale in no way justifies requiring the consuming public to pay more for their products so that a manufacturer can insure against the possibility that some of his products will not meet the business needs of some of his customers. Finally, there was no inequality in bargaining position insofar as the damages plaintiff recovered in this case are concerned. Unlike the defendant in Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1, White is not seeking to enforce an industry-wide disclaimer of liability for personal injuries. Here, plaintiff, whose business is trucking, could have shopped around until he found the truck that would fulfill his business needs. He could be fairly charged with the risk that the product would not match his economic expectations, unless the manufacturer agreed that it would. Indeed, the Uniform Commercial Code expressly recognizes this distinction by providing that limitation of damages is Prima facie unconscionable in personal injury cases, but not in cases of commercial loss.

Since *Santor* and *Seely* there has not been a great deal of discussion in the cases over whether loss other than personal injury and property damage is recoverable under strict liability in tort. Few cases have followed *Santor*. E.g., O. M. Franklin Serum Co. v. C. A. Hoover & Son, 418 S.W.2d 482 (Tex. Sup.1967). Several cases have followed *Seely*. E.g., Southwest Forest Industries, Inc. v. Westinghouse Electric Corp., 422 F.2d 1013 (9th Cir. 1970); Price v. Gatlin, 241 Or. 315, 405 P.2d 502 (1965); Rhodes Pharmacal Co. v. Continental Can Co., 72 Ill.App.2d 362, 219 N.E.2d 726 (1966); Eli Lilly Co. v. Casey, 472 S.W.2d 598 (Tex.Civ.App.); Miehle Co. v. Smith-Brooks Printing Co., 303 F.Supp. 501 (D.Colo.1969). The Court notes that his esteemed colleague, Chief Judge Devitt of the District of Minnesota, in applying the Minnesota law of strict liability in tort, which is quite similar to Iowa's held that economic or commercial loss is not recoverable. Noel Transfer & Package

Delivery Service, Inc. v. General Motors Corp., 341 F.Supp. 968, 970 (D.Minn. 1972). ("Although the Minnesota Supreme Court has not directly passed upon this question, it appears that in Minnesota the doctrine of strict liability does not apply beyond the area of physical harm caused to the user or his property.")

It is interesting to note that New Jersey has retreated somewhat from its position in *Santor* in the situation where parties are bargaining at arm's length in a commercial setting. Moreia Construction Co., Inc. v. Moretrench Corp., 97 N.J.Super. 391, 235 A.2d 211, aff'd, 51 N.J. 405, 241 A.2d 236.[3] California also seems to have modified its absolute position in *Seely*. Gherna v. Ford Motor Co., 246 Cal.App.2d 639, 55 Cal.Rptr. 94 (1966) (physical loss of the product itself, a car caught fire, held recoverable under strict liability in tort).

Finally, the Court notes Cova v. Harley Davidson Motor Co., 26 Mich.App. 602, 182 N.W.2d 800 (1970). In *Cova*, the court stated that such terms as "strict liability" or "implied warranty" were misleading, and opted for the term "products liability." There, the court allowed recovery under a theory of "products liability" of cost of repair of golf carts; the court further left open for determination on retrial whether the plaintiffs could recover for loss of business profits—economic loss. The opinion was predicated upon a finding of inequality of bargaining position between the parties.

■ The Court need not go so far as to determine whether as a general rule the Iowa Supreme Court would allow recovery of damages for repair to the product and for consequential damages under the theory of strict liability in tort. It may be that in a situation where there is inequality of bargaining position between the consumer and the manufacturer, the Iowa Court would allow such recovery. The Court concludes,

however, that under the facts of this particular situation, the Supreme Court of Iowa would not allow recovery of the type of damages plaintiff herein seeks to recover under the theory of strict liability in tort. The transformer in question was purchased on special order. It was not a mass-produced item—the type of item typically involved in a strict liability case. Plaintiff participated in the design of the transformer and periodically inspected it as it was being built. The parties herein dealt at arm's length and were fully aware of the details of their bargain. It is clear from the contract documents that it was the intention of the parties that the plaintiff should bear the type of loss it is now seeking to recover from the defendant. There can be no doubt that this was fully understood by the plaintiff. This same equality of bargaining position is evident with respect to the incident when the transformer was repaired the first time.

■ The loss plaintiff is seeking to recover is a commercial loss. The plaintiff is a large corporation, fully cognizant of commercial law. The doctrine of strict liability in tort, designed to aid the consumer in an unequal bargaining position who is physically injured, loses all meaning when a large public utility or other large company is the plaintiff and is suing solely for commercial loss. Accordingly, under these facts, the Court holds that the doctrine of strict liability in tort is not available to this plaintiff.

This was an extremely difficult point of law for the Court to determine. The Court would have been deeply comforted by some guidance of the Supreme Court of Iowa in this nascent area of the law. The Court notes that in several states, including Washington, Maine and Florida among others, there is provision in the state law whereby a federal court can certify to the highest court of the state questions of law which have not

3. See Rosenau v. City of New Brunswick, 51 N.J. 130, 238 A.2d 169, 175 (1968).

been decided by the high court of the State. See, In re Elliott, 74 Wash.2d 600, 446 P.2d 347 (1968). See also National Conference of Commissioners on Uniform State Laws, Uniform Certification of Questions of Law Act. Authority under Iowa law to certify questions such as this one to the Supreme Court of Iowa would be warmly welcomed by this Court. It is not all that often that the Court finds no guidance in the law of Iowa on an issue in diversity cases, but in that unusual situation, the Court feels that it would be much better for the party litigants to have the means whereby the law in question could be decided by the Supreme Court of Iowa, consistent with their right to have their case itself tried in federal court.

## II. IMPLIED WARRANTY.

■ There appear to be no facts in dispute as it relates to Count I which is predicated upon breach of implied warranty. The law in Iowa at that time provided for negation or variation of implied obligations by express agreement. Iowa Code, Section 554.72 (1958) & (1962) provided:

"554.72 *Variation of implied obligations.* Where any right, duty, or liability would arise under a contract to sell or a sale by implication of law, it may be negatived or varied by express agreement or by the course of dealing between the parties, or by custom, if the custom be such as to bind both parties to the contract or the sale."

Prior to the adoption of the U.C.C. in Iowa, therefore, disclaimers of implied warranties by apt language were allowed. Rasmus v. A. O. Smith Corporation, 158 F.Supp. 70, 89–93 (N.D.Iowa 1958).

In the instant case it is clear that apt language was used in the "Conditions of Sale" under the heading of "Warranty and Test":

"No other warranty, except of title, shall be implied, and any statutory warranties shall be deemed waived." Defendant effectively disclaimed all implied warranties through the above-quoted language contained in the contracts, negotiated at arm's length, for the sale and repair of the transformer.

## III. NEGLIGENCE

Count V of the Complaint deals with plaintiff's allegations of negligence. The facts again do not appear to be in dispute.

■ In Iowa, while recovery for commercial losses or consequential damages is not possible under strict liability in tort, it would be possible if negligence can be proven. Peters v. Lyons, 168 N.W.2d 759, 765 (Iowa 1969). The issue here, however, is whether or not liability for negligence was disclaimed.

■ The "Conditions of Sale" agreement did not use the exact negligence terminology, but apt language was used:

"Liability.

. . . Company's liability to purchaser whether in contract or in tort arising out of . . . defects *from any cause*, shall be limited to correcting the equipment as aforesaid.

\*　\*　\*　\*　\*　\*

General.

Company shall not *in any event* be liable for indirect, special, *consequential* or liquidated damages or penalties." (Emphasis added)

There is no doubt that the disclaimer provisions include negligence when the words used in the provisions in question are given their ordinary and usual significance in accordance with the rule of construction in Iowa. Fire Association of Philadelphia v. Allis Chalmers Manufacturing Company, 129 F.Supp. 335, 362 (N.D.Iowa 1955). It appears that, as a matter of law, defendant effectively disclaimed and plaintiff waived any cause of action for negligence with respect to the sale or repair of the transformer in question.

## IV. EXPRESS WARRANTY

■ Count II of plaintiff's Complaint sounds in breach of express warranty;

Count III pleads straight breach of contract. The facts and law applicable to both counts are essentially the same. The obstacle to plaintiff's recovery under either theory is the language contained in the contracts for sale and repair under the heading, *"Warranty and Tests."* This limits the obligation of the defendant to one year after shipment, or if the equipment is installed by defendant, to one year after completion of installation or eighteen months after date of shipment, whichever occurs first. This language is clear and unambiguous. Plaintiff contends that it should be able to show by extrinsic evidence that the warranty provisions were intended to apply only to defects which could have been discovered during the extensive testing procedures carried on by the parties. Plaintiff then contends that the defects it complains of were latent, and not discoverable by the extensive testing undertaken, and that the warranty time limitations do not apply. Plaintiff contends that this was the intention of the parties. While it is true that Iowa has relaxed the parol evidence rule somewhat in recent years to allow extrinsic evidence in for the purpose of interpreting even clear and unambiguous integrated contracts, the Court does not believe that this aids the plaintiff in this case. Christensen v. Miller, 160 N. W.2d 509 (Iowa 1968); Rasch v. City of Bloomfield, 261 Iowa 544, 153 N.W.2d 718 (1967). The language in the warranty clause is simply too clear to be subject to the interpretation plaintiff seeks to give it. It is without dispute that the breakdowns of which plaintiff complains occurred well after the limitations periods contained in the warranty provisions of the contracts for sale and repair of the transformer. These limitations periods are valid; plaintiff cannot recover under Counts II and III.

Accordingly, it is ordered that defendant's motion for summary judgment with respect to Counts I, II, III, IV and V of plaintiff's complaint be, and it is hereby, sustained.